***E-FILED - 7/29/11***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PELISI FOKETI FONUA, | No. C 09-3126 RMW(PR) |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY |
| v. | |
| R. E. BARNES, Warden, | |
| Respondent. | |

Petitioner, a state prisoner proceeding pro se, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer, along with a memorandum of points and authorities and exhibits. Petitioner has responded with a traverse. For the reasons set forth below, the petition is **DENIED**.

## BACKGROUND

On November 17, 2005, petitioner was convicted by a jury in Contra Costa County Superior Court of attempted second degree murder (Cal. Pen. Code §§ 187(a)/664(a)), two counts of inflicting corporal injury on a spouse (Cal. Pen. Code § 273.5(a)), felony child endangerment (Cal. Pen. Code § 273a(a)), and assault with force likely to produce great bodily injury (Cal. Pen. Code § 245(a)(1)). (Clerk's Transcript ("CT") at 455-64.) The jury also found true enhancement allegations that petitioner used a deadly or dangerous weapon (Cal. Pen. Code

1 § 12022), and personally inflicted great bodily injury under circumstances involving domestic

2 violence (Cal. Pen. Code § 12022.7(e)).  (CT at 457-58, 460-61.)  Petitioner was sentenced to a

3 total unstayed term of sixteen years and four months.  (CT at 582.)

4        The charges in this case result from two incidents, the first occurring on February 8,

5 2004, and the second occurring on August 31, 2004.  The following facts surrounding the

6 incidents are taken from the opinion of the California Court of Appeal (People v. Fonua, 2008

7 WL 5191707 (Cal. App. 1 Dist. Dec. 11, 2008)).

8 **A.**     **February 8, 2004**

9        Petitioner and Kalolaine Saluni ("Kalo") were married in May 2000 and divorced in

10 October 2004.  They have three children together.  Prior to their divorce, the couple separated

11 and reconciled twice.

12        In February 2004, petitioner and Kalo were separated, but maintained contact.  Kalo and

13 her three children were living with her parents in Concord.  On the evening of February 7,

14 petitioner, Kalo and their children visited Kalo's cousin Eni at her apartment in Crockett.  At

15 approximately 8:00 p.m., Kalo and Eni left the apartment to run an errand, leaving petitioner and

16 Eni's husband to watch the children.  Rather than return home from the grocery store, the women

17 decided to go to a nightclub in Mountain View.  They stayed at the club until it closed and then

18 went to a casino to play poker.

19        Kalo and Eni returned to the apartment at 8:00 a.m. on February 8.  Eni woke her

20 husband, who was sleeping on the living room couch, and they both went to their bedroom.

21 Petitioner was asleep with his three-month-old baby on a bed that had been set up in the living

22 room.  Kalo lay down on the living room floor next to her two older children, who were also

23 asleep.  Approximately a half-hour later, petitioner began yelling at Kalo and punching her.  He

24 picked up a toy crystal ball made of glass and held it in his hand as he hit her in the head.

25        One of Eni's children woke Eni at some point during the beating, telling her to go to the

26 living room because petitioner was hitting Kalo.  When she entered the room, Eni saw that

27 petitioner was "[b]eating up Kalo."  Kalo was on the floor, and petitioner was hitting her with his

28 hand.  Eni told him to stop.  She saw Kalo look up just as petitioner kicked her in the face.  Then,

1  petitioner took Kalo's cell phone and broke it against the side of a dresser. He also took Eni's
2  house phone, telling Kalo that he did not want her to call the police.
3       Later that morning, Eni made breakfast for everyone. She then left the apartment with
4  her husband. Petitioner and Kalo stayed behind with the children. Petitioner became annoyed
5  with his son during breakfast, and threw him against a chair. Kalo told him not to hit their son
6  and that, if he was mad at her, he should take it out on her. Petitioner grabbed a knife and
7  threatened that if Kalo called the police, he would make her jump off the balcony of Eni's third-
8  floor apartment.
9       After Eni and her husband returned to the apartment, petitioner and Kalo prepared to
10 leave with their children. Petitioner told Kalo that she should not try to run or "do anything"
11 because he would come after her. The two left with their children and checked into a motel
12 together. Petitioner continued to threaten that if Kalo called the police, he would harm her and
13 her family. On February 9 or 10, after returning to her home, Kalo reported the incident to the
14 Crockett police.
15      On February 11, Kalo and Eni were interviewed about the incident by a Contra Costa
16 County deputy sheriff. The sheriff took photographs of Kalo showing bruising and swelling
17 above her lip and on her cheek. He noticed that she had a contusion on her head.
18      At some point after the February 8 incident, petitioner asked Kalo whether she had
19 pressed charges. She told him that she had because she knew that, if she did not, he would hit
20 her again. Petitioner asked her repeatedly to drop the charges, but she refused.
21 **B.    August 31, 2004**
22      Petitioner and Kalo remained separated through August 2004, at which time Kalo was
23 living in Concord with her children and a friend, Nunia Leakehe ("Nia"). On August 31, 2004,
24 at approximately 6:00 p.m., petitioner picked Kalo up from work. He had taken her car to be
25 repaired a few days before, and was returning it that evening. Petitioner and Kalo had gotten
26 into an argument regarding the care of his children from an earlier marriage; the argument
27 continued during the drive to Kalo's apartment. After dropping Kalo off, petitioner went out for
28 a few hours.

Petitioner returned to Kalo's apartment at approximately 11:00 p.m. The two older children had gone to their grandmother's house, but the baby was home with Kalo and Nia. Petitioner and Kalo had previously agreed that Kalo would drive him to his home in Sacramento that night, but petitioner asked to stay at Kalo's. Kalo told him he had to leave and threatened to call the police; she picked up the phone and pretended to dial. Petitioner agreed to leave. He went into the kitchen, and Kalo hung up the phone and went to the laundry area in the hallway.

Kalo had started to do laundry when she saw a "splash of blood" fly across her cheek. She realized that petitioner was stabbing her. Petitioner said he had warned her against calling the police and told her he would slice her throat. Nia had been sitting on the living room floor with the baby and had seen petitioner return from the kitchen with a knife. She saw that he was angry and that he intended to stab Kalo.

Petitioner put his hand on Kalo's head to hold her down while he tried to stab her in the stomach; Kalo screamed for him to stop. Nia ran out of the apartment in search of help. Petitioner continued the assault against Kalo, stabbing and punching her. When he moved toward the living room, Kalo tried to escape to a bedroom off the hallway. Petitioner caught hold of her before she could close the door, and started punching her. Then he dragged her by her hair into the living room and threw her to the floor, near the baby. Petitioner stood over Kalo as she lay on the floor, and punched her repeatedly.

Nia had gone to a neighboring unit in the apartment complex to seek help. In response to Nia's frantic pleas, Sarah Salgado – a woman visiting the complex – ran to Kalo's apartment. She opened the door and saw blood everywhere. She saw Kalo lying on the floor, very close to the baby. Petitioner was standing over Kalo, "striking her as if stabbing her." The baby was so near petitioner that Sarah thought "he was going to like possibly snap the baby's head or something," as he swung his arm to hit Kalo. Sarah screamed for help, and petitioner moved toward her. This allowed Kalo to flee the apartment. She was covered in blood and had difficulty standing.

Petitioner followed Kalo, and Nia saw him pull her hair and try to drag her back into the apartment. Several witnesses saw petitioner hitting Kalo in the head with a cooking pot as he

chased her through the apartment door. He struck her so hard in the head with the pot that Sarah had to look away. Sometime during the assault with the pot, the bowl of the pot broke away from the handle and flew through the air.

Kalo's next-door neighbor attempted to fend petitioner off by hitting him across the back with a wooden chair. Petitioner grabbed the chair and used it to beat Kalo until the chair broke. Kalo felt her arm break and fell to the ground, at which time petitioner stopped hitting her. Petitioner left the apartment and drove to the home of a family friend.

Kalo was taken to the hospital. She had a three-centimeter-long laceration near her jaw bone; she suffered jagged cuts to her mouth, scalp, neck, chest, arms, and fingers; and her left forearm was fractured. The trauma surgeon who treated Kalo ultimately determined that the injuries were not life-threatening, but many of her wounds required surgery to repair.

The Concord police arrived at Kalo's apartment to conduct a crime scene investigation at 11:30 p.m. on August 31. A broken knife was found on the living room floor. The blade was separated from the handle and both pieces were covered in blood. Bloody pieces of chair were found scattered in the front yard. A bloody cooking pot was found near the apartment patio.

### C. **Petitioner's Testimony**

Petitioner testified that he neither assaulted Kalo on February 8, 2004, nor initiated the August 31, 2004 incident. According to petitioner, he was asleep on the morning of February 8 when Kalo and Eni returned to Eni's apartment. Kalo gave petitioner a hug, and he asked where she had been. She told him that they had gone to a bar, where his "bitch attacked her." Petitioner testified that he and Kalo often argued during this period of their separation about the fact that petitioner had girlfriends. During breakfast that morning, petitioner noticed that Kalo had an injury on her mouth; he teased her and told her that is what happens when you go to the bar. Petitioner testified that he, Kalo and the children left Eni's for Sacramento after eating breakfast.

Petitioner recalled that he was later questioned by a police officer about the February 8 incident. He testified that when he subsequently spoke to Kalo about the police questioning, she said that Eni had told her to call the police because Eni does the same to her husband. When

1  petitioner asked Kalo why she lied about the events of February 8, she responded, "[t]hat's their
2  fault for believing me."

3      Petitioner also testified that he was not the initial aggressor in the August 31, 2004
4  incident.  He said that he and Kalo were not separated at that time, and that he stayed with her
5  and the children at the apartment in Concord when not working construction out of town.  On the
6  morning of August 31, he and Kalo woke up together and had breakfast at McDonald's.
7  Petitioner kissed her goodbye when he dropped her off at work.  When he returned for her that
8  evening at 5:45 p.m., she was upset with him for being late.  They picked up Nia and the children
9  and went to dinner.  Then, petitioner dropped everyone off at the apartment and left to go to his
10 aunt's house in Fremont.

11     When petitioner returned to the apartment at 11:00 p.m., Kalo was angry.  She did not
12 believe that petitioner had gone to his aunt's house, and accused him of being with his "bitch."
13 Petitioner tried to joke with Kalo and asked her for a kiss, but she hit him.  He then picked up his
14 baby daughter and lay with her on the living room couch.  He kissed the baby, but Kalo told him
15 not to because his "mouth smell[ed] like somebody's vagina."  She threatened to call the police
16 if he kissed his daughter again.  Petitioner replied, "You can go ahead and call the police because
17 you do that all the time so I don't care no more."  Kalo put the phone down and started folding
18 laundry; she again told petitioner to leave.

19     Petitioner testified that he would have been happy to leave the apartment that night
20 because it would have saved him a morning commute to Sacramento, where he was working a
21 construction job.  He told Kalo he would leave after a half-hour nap on the couch.  Then he fell
22 asleep.  Petitioner awoke to pain in his feet, where something was poking him.  He saw Kalo
23 moving toward him with a knife; she was telling him to leave.  He asked her to hand him the
24 knife and tried to take it from her, but she backed away and made jabbing motions at him.
25 Petitioner noticed that Kalo was bloody and said, "Honey, look at you.  You've got blood on
26 you."  He again tried to take the knife.  When asked by trial counsel how Kalo's face was cut,
27 petitioner said, "she bent over and she was moving the knife around and we were struggling with
28 the knife.  I don't know how she got hurt."  Petitioner testified that he never put his hand on

Kalo's head or pulled her down, though he at one point grabbed her hands and said, "Honey, let the knife go, let the knife go. Look at you, you are bleeding." He testified that his own hands were bleeding and that one of his fingers was almost cut off.

At some point, petitioner backed away from Kalo into the kitchen. He grabbed a small cooking pot (the only one they kept in the house) and used it to "hit the knife out of her hand. The handle went one way and the blade went the other way." Kalo then tried to take the pot from petitioner. She pulled on the bowl of the pot until it broke off, leaving him holding the handle. Petitioner testified that he and Kalo returned to the living room, where she tripped and fell. She got up and walked toward the children's room, bumping into the bunk bed. Petitioner tried to guide her out of the apartment, but she stumbled and fell again. Kalo returned to her feet, but bumped into the refrigerator. Petitioner took her by her hands and led her out of the apartment.

Once outside, petitioner pulled Kalo toward him. She "wasn't on the right side of her mind," and petitioner tried to calm her down. He testified that a woman yelled for him to "[j]ust leave her alone." Then, petitioner felt something hit him in the back. He turned to face a man hitting him with a chair. Petitioner pushed the man away, and the man threw the chair down and ran to the back of the apartment building. Petitioner denied hitting Kalo with the chair. He also denied any intention to hurt Kalo on the night of August 31; rather, he intended only to take the knife from Kalo. He denied ever hitting Kalo with a pot. Petitioner instead testified that he had used a pot to try to hit the knife out of Kalo's hands.

## DISCUSSION

### A. Standard of Review

Because the instant petition was filed after April 24, 1996, it is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which imposes significant restrictions on the scope of federal habeas corpus proceedings. Under the AEDPA, a federal court may not grant habeas relief with respect to a state court proceeding unless the state court's ruling was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was

Order Denying Petition for Writ of Habeas Corpus
P:\PRO-SE\SJ.Rmw\HC.09\Fonua126denhcfinal.wpd                 7

based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

"[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" Id. at 409. In examining whether the state court decision was objectively unreasonable, the inquiry may require analysis of the state court's method as well as its result. Nunes v. Mueller, 350 F.3d 1045, 1054 (9th Cir. 2003). The "objectively unreasonable" standard does not equate to "clear error" because "[t]hese two standards . . . are not the same. The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

A federal habeas court may grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion, which in this case is that of the

California Court of Appeal.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 801-06 (1991).

**B.     Petitioner's Claims**

As grounds for habeas relief petitioner asserts that: (1) the trial court erred in instructing the jury with California Jury Instruction ("CALJIC") No. 2.61 because the instruction violated his right to due process and penalized him for exercising his right to testify; (2) the trial court erred in failing to instruct the jury on assault with a deadly weapon as a lesser-included offense of attempted murder; (3) the trial court's imposition of the upper term sentence violated his right to due process and a fair trial; and (4) his trial attorney's failure to investigate and present evidence corroborating petitioner's testimony deprived him of his Sixth Amendment right to effective assistance of counsel.

      1.     Improper Jury Instruction

Petitioner first argues that the trial court erred by instructing the jury with CALJIC 2.61, which states:

> In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him. No lack of testimony on defendant's part will make up for a failure of proof by the People so as to support a finding against him on any essential element.

(Reporter's Transcript ("RT") at 1254.)  Petitioner contends that the instruction "penalized [p]etitioner for exercising his right to testify and shifted the burden of proof by suggesting that [petitioner] bore some burden of explanation." (Pet. at 16.)  Yet, petitioner cites no federal law to support this contention.  He instead cites the use notes for the instruction, along with a California appellate case assessing the instruction, for the proposition that CALJIC 2.61 should not be given <u>sua</u> <u>sponte</u>.  However, a challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72 (1991).

Nor can petitioner show that the instruction "had substantial and injurious effect or influence in determining the jury's verdict," as required for federal habeas relief.  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)).  In evaluating the effect of the challenged instruction, the court must consider the

overall instructions given to the jury and the evidence in the case. Duckett v. Godinez, 67 F.3d 734, 745 (9th Cir. 1995). At petitioner's trial, the jury was repeatedly instructed on its duty to decide the weight of the evidence and to decide whether the prosecution had proven its case beyond a reasonable doubt.[1] Petitioner fails to show how CALJIC No. 2.61 overrode these mandatory precepts given to the jury requiring stringent standards of proof.

Accordingly, the state court's denial of petitioner's claim that the trial court erred by instructing the jury on CALJIC 2.61 was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor based on an unreasonable determination of the facts. Petitioner is not entitled to federal habeas relief on this claim.

### 2. Failure to Instruct on a Lesser-Included Offense

Petitioner next contends that the trial court denied his right to due process when it refused his request to instruct the jury on assault with a deadly weapon (Cal. Pen. Code § 245(a)(1)) as a lesser-included offense of attempted murder. Petitioner fails to state a viable claim for habeas relief because the failure of a state trial court to instruct on lesser-included offenses in a non-

---

[1]  For example, the court instructed the jury on CALJIC 2.01 as follows:
> [E]ach fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt.

CT at 366.

The court also instructed the jury on CALJIC 2.90 as follows:
> A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his/her guilt is satisfactorily shown, he/she is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him/her guilty beyond a reasonable doubt. [¶] Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.

CT at 388.

capital case, such as this one, does not present a federal constitutional claim. Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000).

Furthermore, the state appellate court determined that, under California law, assault with a deadly weapon is not a lesser-included offense of attempted murder. Fonua, 2008 WL 5191707, at *17. To the extent that petitioner is challenging the state court's interpretation of its own law, this claim is not cognizable on federal habeas. Estelle, 502 U.S. at 67-68. Accordingly, petitioner is not entitled to federal habeas relief on this claim.

   3.  <u>Unconstitutional Use of Aggravated Sentencing Factor</u>

Petitioner also contends that his constitutional rights were violated by the trial court's imposition of the upper term sentence for attempted murder, based on aggravating factors that were not supported by jury findings. Specifically, petitioner argues that the judge's finding that petitioner was on probation at the time of the offense was an improper factor on which to rely in increasing his sentence.

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court held that any fact that increases a criminal sentence beyond the statutory maximum must be decided by the jury beyond a reasonable doubt. Petitioner acknowledges that Apprendi carves out an exception for "the fact of a prior conviction," Apprendi at 490, but argues that his probationary status does not fall within the scope of this exception. Petitioner's argument is foreclosed, however, by the Ninth Circuit's holding in Kessee v. Mendoza-Powers, 574 F.3d 675 (9th Cir. 2009). The court in Kessee ruled that a state court's determination that the probation factor falls within the Apprendi exception is not an unreasonable application of clearly established federal law. Id. at 678-79. Here then, the trial court's reliance on petitioner's probationary status in imposing the upper term sentence does not rise to the level of constitutional error.[2]

Accordingly, the state court's denial of petitioner's claim of upper term sentencing error was not contrary to, or an unreasonable application of, clearly established Supreme Court

---

[2] The court also notes that petitioner's probation report was made part of the trial record and that petitioner's counsel conceded in a written statement presented to the court during sentencing that petitioner was on probation at the time of the offense. (CT at 509, 560.)

precedent, nor based on an unreasonable determination of the facts. Petitioner is not entitled to federal habeas relief on this claim.

### 4. Ineffective Assistance of Counsel

Finally, petitioner contends that his trial attorney's failure to discover and present certain evidence supporting petitioner's defense deprived him of his right to effective assistance of counsel. Specifically, petitioner claims that his attorney (1) failed to call petitioner's former lawyer as a trial witness, and (2) failed to retain an expert metallurgist to examine the knife found at the scene of the crime. Petitioner argues that these failures resulted in a lack of corroborating evidence for the defense and had a prejudicial effect on the jury verdict. The court disagrees.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. Id.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Id. at 687-88. Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Id. at 689; Wildman v. Johnson, 261 F.3d 832, 838 (9th Cir. 2001). Second, petitioner must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.

At trial, petitioner testified that he was not the aggressor in the August 31, 2004 incident. Rather, he claimed that his wife attacked him with the knife and that they both were injured

when he tried to wrest it from her. (RT at 1167-70.) He testified that when he could not take the knife from Kalo, he struck it with a pot, causing the blade to break away from the handle. (<u>Id.</u> at 1174-76.) Petitioner has produced declarations from his former lawyer, Paul Puri; his trial counsel, Wayne Anderson; and metallurgical engineer Gordon Lakso, which he argues support his trial testimony.

The state appellate court addressed petitioner's first allegation of ineffective assistance – that trial counsel should have called petitioner's former attorney, Paul Puri, to testify – as follows:

> Paul Puri stated that [petitioner] came to his office on September 1, 2004. Puri "vividly recall[ed] that first meeting because [petitioner] was quite bloody." According to Puri, [petitioner] "had a fresh open cut on the inside of his hand, near his finger knuckle. It was crusted with blood and looked nasty. The meat of his finger was exposed." Puri recalled that he thought [petitioner]'s wound "was consistent with one that might be suffered by a person who, being assaulted with a knife, attempts to grab it in self-defense." Puri further stated that, after he withdrew from [petitioner]'s case, he talked with [petitioner]'s new trial counsel, Wayne Anderson, several times, described his observations of [petitioner]'s hand and offered to testify at [petitioner]'s trial but was never called to appear.
>
> Wayne Anderson stated that he represented [petitioner] after retained counsel, Paul Puri, withdrew from the case. Anderson talked with Puri about the case several times and Puri described a cut he saw on [petitioner]'s hand during their first meeting. Anderson intended to call Puri as a witness and could not remember the reason or reasons he ultimately decided not to call Puri. Anderson did recall that Puri also told him about a potential witness who claimed that Kalo told her that she was the initial aggressor and that she assaulted [petitioner] with the knife. This woman later admitted that her story was untrue and Anderson stated in his declaration that he may have been concerned that the recanted story might come out if Puri was subject to cross-examination at trial. Anderson also stated that Puri may have had a scheduling problem.
>
> . . .
>
> Although Anderson claims not to recall why he decided not to call Puri as a witness, several reasons occur to us. Notwithstanding his colorful description of [petitioner]'s wound, the substantive information Puri had to offer could have been used to reinforce the prosecution's trial theory. Puri would have told the jury that [petitioner] suffered *only one cut to his finger* during the August 31 incident. Defense counsel could reasonably have concluded that it was unwise to underscore this fact to a jury who was presented with overwhelming evidence documenting the bloody crime scene and Kalo's extensive injuries. Indeed, since Puri noticed only a single cut on one of [petitioner]'s fingers, the references in Puri's declaration to [petitioner]'s "bloody" and "dramatic" appearance may well have

> been additional evidence of the violent injuries [petitioner] inflicted on his wife.
>
> Furthermore, defense counsel could have made the reasonable tactical decision not to call Puri because he was [petitioner]'s former attorney. To the extent Puri's proposed testimony was potentially helpful, the jury may have discounted or disregarded it because Puri had been paid to represent [petitioner] and yet withdrew prior to trial. Indeed, calling Puri as a witness may have led the jury to speculate that Puri withdrew because he lacked confidence in his former client or thought his case was weak. In addition, as Anderson conceded in his declaration, there may have been a concern about Puri's involvement with or relationship to a potential defense witness who, at some point prior to trial, had expressed a willingness to lie in order to strengthen [petitioner]'s case.

Fonua, 2008 WL 5191707, at *21-23 (emphasis in original).

Trial counsel's failure to call petitioner's former lawyer can reasonably be described as a tactical decision not to expose his client to potentially harmful testimony. Puri is not a forensic expert. His opinion about petitioner's injury would therefore be of little value, and indeed could have been challenged to damaging effect on cross-examination. Moreover, Puri's graphic description of petitioner's appearance could have served to underscore to the jury the brutality of the incident. Similarly, the emphasis on petitioner's having suffered only one wound as a result of the allegedly violent struggle for the knife could have undermined the defense version of events. In light of these likely explanations for trial counsel's failure to call Puri, the state court was reasonable in its determination that petitioner failed to demonstrate deficient performance by counsel.

Petitioner's second allegation of deficiency, that counsel should have called an expert metallurgist to testify regarding the knife, likewise fails. The appellate court addressed the allegation as follows:

> Gordon Lakso is a metallurgical engineer with more than 35 years experience who has qualified and testified as an expert witness in over 125 cases. Lakso stated that he was retained by [petitioner] to examine a broken knife that was introduced into evidence in this case, that he accompanied [petitioner]'s appellate counsel, Mark Shenfield, to the clerk's office of the courthouse where the trial occurred, retrieved the knife and examined it. Lakso further stated that "[i]t is my opinion that the bends in the knife are consistent with petitioner's trial testimony that his wife assaulted him with it and that he struck the knife with a metal pot to knock it from her hand."
>
> According to Lakso, an examination of the knife under 25x

> magnification revealed that "the point of the knife is fractured and that a tiny metal fragment adheres to it." Lakso offered the "opinion that a metal pot striking the point of the knife could have caused the point to penetrate slightly into the pot material and therefore be fractured away." Lakso referenced a principle of forensic science "that states that a transfer of material will occur whenever two objects come into contact," and stated that "[i]t is my opinion that the metal fragment adhering to the fractured point of the knife may have been transferred to it from a metal pot striking the knife."
>
> . . .
>
> Anderson's representation did not fall below an objective standard of reasonableness because he failed to employ an expert metallurgist to examine the knife. [Petitioner] completely fails to explain why a reasonable attorney should have been expected to engage such an expert. Only one pot was found at the crime scene, and it was broken on the ground outside Kalo's apartment. Furthermore, virtually every percipient witness to the August 31 incident testified that [petitioner] repeatedly hit Kalo with that pot until it broke. Although [petitioner] claimed not to have engaged in that conduct, he offered no explanation as to how the pot broke or why it was outside. Indeed, [petitioner] claimed that he never even touched that pot and that he used a different pot to hit the knife out of Kalo's hand. However, there was no evidence of a second pot. Absent such evidence, characterizing Anderson's failure to retain an expert to examine the knife as deficient performance is simply not reasonable.
>
> Considering the substance of Lakso's potential testimony only reinforces our conclusion. He offered three opinions: (1) the bends in the knife were "consistent" with [petitioner]'s testimony that he used a pot to hit the knife out of Kalo's hand; (2) striking the point of the knife with a metal pot "could" have caused the point to fracture; and (3) a metal fragment adhering to the fractured point of the knife "may" have been transferred to it from a metal pot. None of these proffered opinions actually corroborates [petitioner]'s testimony, particularly in light of the fact that [petitioner] adamantly and repeatedly testified that he never touched the only metal pot that was recovered from the crime scene. Nor do these opinions undermine the testimony of the witnesses who saw [petitioner] with the knife (Kalo and Nia) or those who saw [petitioner] bludgeon Kalo with the pot (Nia, Sarah, Michael, and other neighbors).

Fonua, 2008 WL 5191707, at *22-23.

After a careful review of the record, the court finds that the state court reasonably rejected petitioner's ineffective assistance claim for trial counsel's failure to call a metallurgical expert. At trial, several eyewitnesses gave testimony contradicting petitioner's explanation for the broken knife and describing petitioner's assault on Kalo with the retrieved cooking pot. *See* RT at 156-73, 562-76, 658-64, 725-27. There was no evidence to suggest the existence of a second cooking pot. Nor is Lakso's declaration sufficient to substantiate petitioner's version of

1  events. The appellate court was therefore reasonable in concluding that an objectively

2  reasonable attorney could not have been expected to engage an expert metallurgist.

3      Further, it is not reasonably probable that the result of petitioner's trial would have been

4  different but for counsel's alleged failings. As the appellate court held:

> [T]here is no probability . . . that the outcome of these proceedings would have been altered by Puri's testimony that [petitioner] suffered a single cut on one finger that looked to him to be a defensive wound, or by Lakso's testimony that the bends in the knife and its broken tip were consistent with [petitioner's] claim that he hit it with a pot . . . The evidence against [petitioner] was nothing short of overwhelming and that evidence simply was not contradicted or in any way inconsistent with the declarations of the two potential witnesses that [petitioner] now identifies.

Fonua, 2008 WL 5191707, at *24.

    Petitioner's allegations fail to satisfy the prejudice prong under Strickland because the probative value of Puri and Lakso's proposed testimony was far outweighed by the evidence against petitioner. *See* RT 156-84 (Kalo's testimony); RT at 418-36, 476-500 (testimony of witness Sarah Salgado); RT at 648-75 (testimony of neighbor Michael Hanratty); RT at 560-83 (Nia's testimony); RT at 705-28 (testimony of neighbor Jennifer Lauper); RT at 762-87 (testimony of Kalo's treating surgeon, Dr. Michael deBoisblanc). In sum, looking at the overwhelming evidence in the record against petitioner, it cannot be said that the result of his trial would have been different but for the exclusion of Puri and Lakso's testimony.

    Accordingly, the state court's rejection of petitioner's ineffective assistance of counsel claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, nor based on an unreasonable determination of the facts. Petitioner is not entitled to federal habeas relief on this claim.

///
///
///
///
///
///

///

///

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**. The clerk shall enter judgment and close the file.

## CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling. Petitioner has failed to make a substantial showing that his claims amounted to a denial of his constitutional rights, or demonstrate that a reasonable jurist would find the denial of his claims debatable or wrong. Slack v. McDaniel, 529 U.S. 473, 484 (2000). Accordingly, a COA is **DENIED**.

IT IS SO ORDERED.

DATED: 7/28/11

RONALD M. WHYTE
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PELISI F. FONUA,<br><br>        Plaintiff,<br><br>  v.<br><br>R.E. BARNES et al,<br><br>        Defendant. | Case Number: CV09-03126 RMW<br><br>**CERTIFICATE OF SERVICE** |

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on July 29, 2011, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Pelisi Foketi Fonua F-30908
Correctional Training Facility
CW-103L
Post Office Box 689
Soledad, CA 93960

Dated: July 29, 2011

                                                Richard W. Wieking, Clerk
                                                By: Jackie Lynn Garcia, Deputy Clerk